(Hamilton Co., O. Common Pleas Court.)
(No. 108809.)

ANDREW v. AUDITOR.

---

(No. 109043.)

COBB, TRUSTEE, v. AUDITOR.

---

(No. 109119.)

McFARLAN v. AUDITOR.

---

1. The act of the General Assembly, entitled "An act to authorize the Commissioners of Hamilton County to improve Michigan and Shaw avenues, in section 27, Columbus township," passed April 13, 1893, is unconstitutional.

2. A petition upon which legislation for a public improvement is founded becomes absolute when the petitioned board assumes jurisdiction by acting upon it.

3. Where some of the heirs of a deceased partner are minors, and certain real property, although standing in the firm name, is not used for partnership purposes, and there are no partnership debts, the surviving partner has no right to sign the firm-name to a petition which would subject such property to assessment for a street improvement.

4. Estoppel under the Manss case, 54 Ohio St., 257, relates to the signer whose representations are relied upon, and has no effect to bind his co-petitioners.

5. The words "to dispose of", used in a declaration of trust, construed with reference to context and subject matter.

6. The principles of estoppel, laid down in Tone v. Columbus, 39 Ohio St., 281-303, applied to a certain state of facts.

7. Before acts of an agent are introduced to estop a property owner from contesting an assessment, the agency to perform such acts must be clearly shown.

---

JELKE, J.

1. I am of opinion that the act of the General Assembly of the State of Ohio, entitled, "An act to authorize the Commissioners of Hamilton county, Ohio, to improve Michigan and Shaw avenues, in section 27, Columbia Township," passed April 13, 1893, 90 O. L. Local, 224, is unconstitutional. State ex rel. v. Commissioners, 54 Ohio St., 333; Grove v. Leidy 9 C. C., 272 and 53 Ohio St., 662; Hixon v. Burson, 54 Ohio St., 470 and 483.

2. I find that neither Charles Andrew and others, heirs of Peter Andrew, de-

ceased, William E. Galloway, Henry Gunkel, Frederick Danner, John S. Youtsey, Laura B. McFarlan, nor the ancestors in title of any of them, signed the petition to the County Commissioners, and I do not find anything in the testimony estopping them from availing themselves of the unconstitutionality of the law, supra. Columbus v. Agler, 44 Ohio St., 486.

3. It is important to determine from the law and the evidence the time from which the petition speaks. Certain testimony was offered as tending to show that the petition was filed with the commissioners on the 13th day of May, 1893. The first mention of the petition on the commissioners minutes is on June 28th, when action was taken ordering the improvement.

Between May 13th and June 28th, 1893, the following pieces of property changed hands:

### Michigan Avenue.

May 22nd, Laura S. French to E. J. Tully, 50 feet.
May 25th, Laura S. French to Amelia Mark, 50 feet.

### Shaw Avenue.

May 27th, James E. Mooney to Chris. Stichtenoth, 50 feet.
May 29th, James E. Mooney to Chris. Stichtenoth, 50 feet.
May 22nd, Laura S. French to Mary Murphy, 50 feet.
May 22nd, Laura S. French to Ellen Murphy, 50 feet.

In all these conveyances, the grantors were petitioning property owners on May 13th. Hence, the difference of the petition speaking as of May 13th or June 28th, is, as to Michigan avenue, whether 100 feet should go into the petitioning or non-petitioning column of property owners, and as to Shaw avenue, whether 200 feet should go into the petitioning or non-petitioning column of property owners.

The importance of this question is seen when it is noted, that even if either of the contentions of the plaintiff's counsel as to the Knorr property or as to the corner lots were determined in favor of the plaintiffs, yet the deficiency would be overcome and a majority remain if these petitions are to speak as of May 13th.

The act provides, "that a petition of the owners of a majority of the feet front of the lots and lands abutting on said avenues shall first be *filed* with the commissioners of said county, requesting the improvement of the same."

Some doubt is connected with the use of the word "filed," whether it signifies an act of the petitioners, of the county commissioners, or a mutual act of both. The Standard dictionary defines the word: "File, V. * * Law (1) To deposit, as a paper or document in a court or public office. (2) To indorse the fact and date of filing of such paper or document.

There is certainly no evidence of any act by the Board of County Commissioners as such, acknowledging the receipt or recognizing in any way this petition as of date, May 13th, 1893.

It is probably fairer to the county to give the word the signification of an act, performed by the petitioners, as the word "presented," is used in Rev. Stats., 1634 & 1644, and admit, for the purpose of the argument that the petitions were presented or deposited or filed by the petitioners on said May 13th, 1893.

In Dutten v. Village of Hanover, 42 Ohio St., 215, per Johnson, C. J., in proceedings under Rev. Stats., 1647, it was held:

"Upon presentation of a petition to council for such an election it is the duty of the council, before taking action thereon, to satisfy itself that it contains the requisite number of qualified petitioners, and for that purpose may refer the same to a committee to make the necessary examination."

"While such petition is under consideration and before action thereon by the council. signers thereof may withdraw their names from such petition, and if thereby the number of names is reduced below the requisite number, it is the duty of the council to refuse to order such election."

From this it is evident that a petition did not become absolute by being presented to council, but was subject to change and the withdrawal of names, and that the burden was upon council to be assured of the majority required by statute at the moment that it took any action based upon such petition.

The court in Dutten v. Village of Hanover, supra, cites Hays v. Jones, 27 Ohio St., 218, and Grinnell v. Adams, 34 Ohio St., 44, as respectively showing the right and effect of such changes or withdrawals before and after jurisdiction has been assumed by the board by taking some action on the petition. The court per Ashburn, J., in Hays v. Jones, said:

"The jurisdiction of the Board of County Commissioners to make the final order for the improvement, under these statutes, is special, and conditoned upon the consent, at the time the final order is to be made, of a majority of the resident land-holders, who are to be charged with the cost of the improvement."

"Resident land-holders, who have subscribed a petition praying for such road improvement, may, at any time before such improvement is finally ordered to be made by the board of county commissioners, withdraw their assent by remonstrance, or having their names stricken from the petition, and after withdrawal of consent, such person can

no longer be counted as petitioning for the improvement."

In Grinnell v. Adams, the court said: * * * After jurisdiction is thus conferred and *and assumed by the commissioners* is their power to proceed defeated by all or any number of such petitioners subsequently remonstrating against the prayer of the petition being granted? We are unanimous that this question must be answered in the negative."

True, the court went on to say: "In so holding, we do not undertake to overrule the case of Hays v. Jones, 27 Ohio St., 218. That case involved the construction of a statute materially different from the act of 1853, "but the Supreme Court in Dutten v. Village of Hanover, made exactly the same use of these two cases, which I do in the case at bar in fixing the time when a petition becomes absolute, viz: when the petitioned board assumes jurisdiction by acting upon it.

In the matter of Sharp, 56 N. Y., 257: "A petition had been presented to said board and signed by the owners of property fronting on said street, but not a majority as required by the act of 1870. Held: that a signer of said petition was not estopped thereby from questioning the authority of the board and moving to set aside the assessment; that he had a right to rely upon a performance of its duty by the board, which required it, before basing any action on the petition, to ascertain whether a sufficient number had signed to confer jurisdiction."

And our Supreme Court in Tone v. Columbus, 39 Ohio St., p. 33, said: "We think this is a correct statement of the law. Upon principle there is no basis for the estoppel thus claimed. The owner signed the petition for the privileges of the act, for the improvement of the street. He did not thereby represent to the city that his name made the requisite two-thirds; nor waive the legal requirement that upon the presentation of the petition, the city, before basing any action upon it, would ascertain whether the legally required number had signed, and refuse to order the improvement if they had not.

We conclude, therefore, upon principle and authority, that the plaintiff in error is not estopped by the mere fact that he signed the petition, from asserting that the city did not obtain jurisdiction to order the improvement, because two-thirds of the owners had not petitioned."

The act of the legislature involved in the Tone case, supra, is contained in 72 O. L., 153. Sec. 24 of which provides:

"The city council of any such city shall not have the right to authorize any improvement under this act unless the owners of two-thirds of the feet front of the property abutting upon any street or avenue to be improved in said city shall petition the city council for the privileges of this act."

After the Supreme Court had rendered its decision in the Tone case, this case again came up for the application of the principles therein laid down to certain states of facts, and the Circuit Court, Williams, C. J., Cox and Shauck, JJ., in 1 C. C., January, 1886, on page 308, said:

"Other questions arise out of the evidence showing that according to the deed record, some of the petitioners conveyed away their property after signing the petition, but before the passage of the ordinance, and that others did not become owners of abutting property until after the passage of the ordinance. The act contemplated a petition signed by those who were owners of the property at the time of the passage of the ordinance. In view of the rule exempting the plaintiff's from offering plenary evidence, they were relieved of the burden incumbent on them when they showed from the public record that the petitioners in this class were not then the owners of abutting property. It then became the duty of the defendants, who asserted ownership contrary to the record to establish it."

Further, it is in evidence in the case at bar, as it was in the case of Gibson v. City, 9 C. C., 245, that the commissioners did not rely on any representation made by the signers as to their ownership or frontage, but had a full examination made as to all of these matters by their engineer or solicitor, and relied on the report made by him.

Approaching this question from a different point, that is, the condition of the law and not the condition of the petition, Judge Sayler, in Superior Court General Term, in Shehan v. City, 25 W. L. B., p. 212 and 214, said:

"The law in force at the time of the passage of the improvement ordinance, governs with respect to the manner of assessment, and the rights and liabilities of the owners of abutting property (46 Ohio St., 296); this rule is not affected by the fact that the owners of the abutting property petitioned for the improvement."

"The question of the rights of the property owner under a petition to improve was considered by Judge Maxwell in a very able opinion in the case of Black v. The City, decided in October, 1887, and he held that the petition was in the nature of a request, and an agreement that if the city would do certain things, they, in turn would undertake to pay for the improvement in whole or in part, and that this proposition of the property owner was accepted on the part of the city by the passage of the ordinance to improve, and that at that point in the proceedings the property owner acquired vested rights." Also, see:

Douglass v. City, 29 Ohio St., 165, and Cincinnati v. Seasongood, 46 Ohio St., 305.

In the case of Squier v. City, 5 C. C., 400, the Circuit Court of this county seems to differ from the Shehan case and depart from the Seasongood case, 46 Ohio St., 296, but construes the law as in effect on a certain day because the petitions had been filed *and acted upon by the board on that day and this initiated a proceeding.* See 2nd syllabus, p. 400.

From an examination of these cases, I am of opinion that the petition in the cases at bar became absolute, and must be held to speak as of the date when the Board of County Commissioners first assumed jurisdiction on them, and acted in the matter, which was June 28th, 1893, and must be measured as of that date as to the number of front feet signed to them. I am further of the opinion that the burden was upon the Board of County Commissioners to determine whether or not the names of the owners at that time of a majority of the feet front were signed to the petitions, for the purpose of assuming jurisdiction.

"Nor is there anything in the act that implies that they are authorized to determine conclusively by their own action that the pre-requisite consent has been obtained, upon which they have the power to act. They can not thus defeat the rights secured by law to the owners of property on a street proposed to be occupied by a street railroad."

Roberts v. Easton, 19 Ohio St., 86.

I am glad to be able to determine this question as a matter of law as I would not like to have this case turn upon anything so unsatisfactory as the evidence was upon this point. However, my conclusion on the law is in accord with my impression as to the fact.

Omitting that part of Shaw avenue lying south of Erie avenue, and not in the improvement contemplated, and deducting this frontage from the number of feet signed for by James E. Mooney, trustee, I find the petitioning and non-petitioning property on June 28th, 1893, as follows:

MICHIGAN AVENUE.

Petitioning:

| | |
|---|---|
| James E. Mooney, Tr. | 454.56. |
| F. B. Oyer, | 200. |
| O. B. Cobb, Tr. | 300. |
| Laura S. French, | 300. |
| Thomas French, Jr., | 300. |
| A. & H. Knorr | 300. |
| | 1854.56. |

Non-petitioning:

| | |
|---|---|
| Henry Gunkel, | 100. |
| T. S. Youtsey, | 200. |
| A. G. Thomas, | 100. |
| Henry Westons, | 100. |
| Peter Andrew, | 721.91. |
| R. Reinboldt, | 222.05. |
| W. H. Carter, | 100. |
| J. F. Merrill, | 100. |
| E. J. Tully, | 50. |
| Amelia Mark, | 50. |
| | 1743.96. |
| Signed | 1854.56. |
| Not Signed | 1743.96. |
| Majority | 110.60. |

SHAW AVENUE.

Petitioning:

| | |
|---|---|
| Thomas French, Jr., | 300. |
| C. B. Russell, | 300. |
| A. & H. Knorr | 300. |
| J. E. Mooney, Tr., | 505.68. |
| James Ross, | 100. |
| Jennie S. Cresap, | 190.60. |
| Mary E. Reynolds, | 200. |
| | 1896.28. |

Non-petitioning:

| | |
|---|---|
| Peter Andrew, | 1270.75. |
| Ellen Murphy, | 50. |
| Mary Murphy, | 50. |
| Christopher Stichtenoth, | 100. |
| J. H. Feldman, | 100. |
| W. E. Galloway, | 100. |
| B. Frenkel, | 100. |
| C. P. & V. R. R., | 30. |
| | 1800.75. |
| Signed | 1896.28. |
| Not Signed | 1800.75. |
| Majority | 95.55. |

4. This brings us to the consideration of three questions which affect the signatures on both Shaw and Michigan avenues, and the number of front feet represented by such signatures. First, as to the Knorr property, and second, as to the number of front feet to be considered as signing with regard to corner lots under the Haviland case, and third, as to the signature of James E. Mooney, trustee. In addition to these, we have the question of the signature of Orris P. Cobb, trustee, which applies to 300 feet on Michigan avenue only.

It will be seen that if any one of the first three questions above be resolved in favor of the property owners, the petition must fail.

As to the signature of A. & H. Knorr, of all the points in the case, upon this point I am clearest. I am satisfied, and am of opinion that this signature can not be counted as more than the signature of Adam Knorr, and for more than 150 feet, and I feel that the benefit of the doubt is given to the county when this signature is allowed to stand for the 150 feet of Adam Knorr: By the death of Henry Knorr, the partnership was *ipso facto* dissolved, and the testimony showed there were no partnership debts.

Our Supreme Court held in Rammels-

berg v. Mitchell, 29 Ohio St., 23, 7th syllabus:

"But real estate not needed or used for the partnership purposes, though paid for with partnership means, is not assets of the firm within the meaning of this act, notwithstanding the rents and profits thereof be applied to partnership uses."

Likewise see Galbreath v. Gedge, 16 B. Monroe, 631.

As to the claim that Adam Knorr acted as agent, this certainly could not be as to the four minors, and as to the three boys who were of age, in the language of the Tone case, in the Circuit Court, it is "idle to inquire whether such authority was given since it is apparent that it was never exercised." The signature is neither that of the agent nor of the principals. The "& H. Knorr" stood for the seven heirs, or for nobody. It could not stand for the seven heirs, so it stands for nobody. As Adam Knorr's interest was an undivided one-half, and the other one-half was not obtained, I am extremely doubtful whether any part of this 300 feet should be counted, but on this point I give the benefit to the county.

I am, therefore of opinion that as to the signature of A. & H. Knorr, 150 feet will have to be deducted from the petitioning column and added to the nonpetitioning column in the foregoing schedule.

5. As to the corner lots, all of which are represented by the signature of James E. Mooney, trustee, assuming for the purpose of this point, for the time being, that the signature of Mooney is valid and sufficient, I am of opinion that James E. Mooney, trustee, is bound for the full number of feet fronting on these avenues, and represented by the figures appended to his signatures, and can not now avail himself of the decision in the Haviland case.

In the case of the City of Cincinnati v. Manss, (54 Ohio St., 257), the Supreme Court held, per Mitchell, J.

"Where an owner of property on a street unites with others in a petition for its improvement, stating therein the number of feet his property abuts on the street, that the council may be informed as to the interests of the petitioners, he thereby represents to council that he has the number of assessable feet stated in the petition; and after the improvement has been ordered, and the work done, he is estopped to say that he has a less number of feet subject to assessment."

And on page 264, further says:

"There is nothing in the case of Tone v. The City of Columbus. (39 Ohio St., 281,) in conflict with what is here held. It was there held that Tone, by having signed the petition for the improvement, was not estopped from averring and proving that the petition had never been signed by the requisite two-thirds in interest required by the statute under which the proceeding was had; but that is not this case. Manss claims that he signed the assessable number of feet represented in the petition for the improvement, which petition was signed by himself, a very different question from that in the case of Tone."

Such estoppel, however, does not apply to the other petitioners. As to them the corner lots must be considered with reference to their actual frontage on Erie avenue, determining the frontage as per the Haviland case, instead of their abutting length on Michigan and Shaw avenues. Hence the total frontages would be decreased by the amount which the abutting length exceeds the actual frontage, and would be as follows:

Michigan avenue actual frontage, 3598.52.

Deduct for corner lots, N. W. Cor., 125.76.

N. E. Cor., 102.50,—228.36.

Total frontage, 3370.16.

One-half to total frontage, 1685.08.

Mr. Mooney signed for all the corner lots so that the deduction must be made from the total number of feet apparently signed.

Number of feet signed on Michigan avenue, 1854.56.

Deduct for corner lots as above, 1228.36.—1626.20.

Necessary for majority as above, 1685.08.

Deficiency, 58.88.

Shaw avenue actual frontage, 5697.05.

Deduct for corner lots, N. W. Cor., 51.53.

N. E. Cor., 104.16—155.48.

Total frontage, 5541.55.

One-half of total frontage, 1770.775.

Here again both the corners were signed for by Mr. Mooney, so that both are apparently petitioning:

Number of feet signed on Shaw avenue 1896.28.

Deduct for corner lots as above, 155.48—1740.80.

Necessary for majority as above, 1770.775.

Deficiency, 29.975.

I am therefore of opinion that so far as this case is affected by the corner lot question, the petitions as to all the plaintiffs, both petitioning and non-petitioning, excepting James E. Mooney, trustee, are deficient, as to Michigan avenue in the amount of 58.88 feet; as to Shaw avenue in the amount of 29.975 feet.

6. This brings me to a consideration of the sufficiency of the signature of James E. Mooney, trustee. Having found, as I have, in regard to the A. & H. Knorr signature, and as to the date from which the petitions speak, it is perhaps unnecessary for me to pass upon the power of James E. Mooney to sign

these petitions, under the declaration of trust, but I give the matter consideration for two reasons; first, because this question was ably argued and presented by counsel; and second, because if, this question should be resolved in favor of plaintiffs, even though I should be wrong in my conclusion as to the date from which the petitions speak, and they should be held to speak as of May 13th, 1893, and for the number of feet at that time owned by the signers, the petitions would still fail.

James E. Mooney, trustee, held the title to 454.56 feet on Michigan avenue, and 505.68 feet on Shaw avenue.

The terms of the trust and the duties and powers of the trustees are set forth in the declaration of trust as follows: "Now, therefore, we, Albert S. Berry, Charles H. Kilgour, John Kilgour, James E. Mooney, Thomas B. Youtsey and John Zumstein, have made, constituted and appointed, and by these presents do make, constitute and appoint, James E. Mooney, trustee, our true and lawful attorney, for ourselves, and in our names, place and stead, to execute and deliver in his own name, as such trustee, any and all deeds, leases, contracts and other instruments by writing, that he may deem necessary, in order to dispose of any and all of the above described real estate, and so to do at such times, to such person or persons, and upon such terms as he may deem best, giving and granting unto our said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises, as fully to all intent and purposes as we might or could do if personally present, with full power of substitution and revocation, and giving unto the said James E. Mooney, trustee, full authority to appoint and substitute with all the powers, he, the said James E. Mooney, trustee, possesses under their said agreement, hereby rec tifying and confirming all that our said attorney, or his substitute, shall lawfully do, or cause to be done by virtue hereof."

For the purpose of determining whether or not James E. Mooney, as such trustee, had power to sign these petitions, I will dismiss from consideration all oral testimony which may have been introduced, and look only to the instrument itself, and the subject matter, this tract of land, sub-divided and platted as it was.

Tyler v. Granger, 48 Cal., 259.

"When a conveyance is made to a person as a trustee, and he at the same time executes and delivers to the grantor a declaration in writing, in which there is no ambiguity, stating the objects and purposes of the trust, the powers and duties of the trustee, with reference to the trust estate, are to be ascertained

from the deed and the declaration and when so ascertained, the rights and duties of the parties must be controlled thereby."

The discussion centers around the words, "to dispose of" to determine their scope and meaning:

"To execute and deliver in his own name, as such trustee, any and all deeds, leases, contracts, and other instruments by writing, that he may deem necessary in order to dispose of any and all the above described real estate."

I recognize, in the beginning that the signing of such a petition is an exercise of the highest power which can be exercised over real estate. It is, in some respects greater than that of signing a deed of sale or conveyance, because a deed could only transfer subject to existing encumbrances, while a signature to such a petition might and would create a lien which would take precedence over existing encumbrances, and if not paid, ultimately forfeit the property to the state of Ohio.

Counsel for the syndicate and plaintiffs, construes and limits the words, "to dispose of" to a power to sell, and then proceeds to demonstrate that the signing of such a petition transcends a power to sell.

He cites Devlin on Deeds, 436-446a.

Chap. XVII, secs. 431-455, of Devlin on Deeds, treats of the subject of "Deeds by trustees for sale." He also cites, Hoyt v. Jacques, 129 Mass., 286.

"A devise of so much of the testator's estate as may be sufficient for the maintenance of the devisee during his life," he having full power to sell and convey any and all of my real estate, at any time, if necessary, to secure such maintenance" does not give to the devisee the right to mortgage the estate in fee."

There is no doubt about these authorities and the proposition that if this instrument only gives to James E. Mooney power to sell "out and out," that the signing of such a petition would be beyond his power.

Vid. Perry on Trusts, Chap. XXV., secs. 764-768.

I am of opinion that counsel begs the question at the threshold, the words are not "*to sell*" but "*to dispose of*," and we have no right to so limit and restrict their meaning, but we must determine their meaning from themselves, from their context, and by application to the subject matter. "To dispose of," is a far more generic expression than "to sell" and has been held to include a greater number, higher, lower and more varied acts than "to sell."

The United States v. John P. Gratiot et al., Peters Reports S. Court U. S., 526, the syllabus is as follows:

"The words "*dispose of*;" public lands, used in the constitution of the United States, can not under the decis-

ions of the Supreme Court receive any other construction than that Congress has power, in its discretion to authorize the leasing of lead mines on the public lands, in the territories of the United States. There can be no apprehensions of any encroachments upon state rights by the creation of a numerous tenantry within the borders of the states, for the adoption of such measure.''

And the court also says, on page 537: ''And the constitution of the United states (article four, section three), provides: That Congress shall have power *to dispose of* and make all needful rules and regulations respecting the territory or other property belonging to the United States.'' The term, territory, as here used, is merely descriptive of one kind of property; and it is equivalent to the word lands. And Congress has the same power over it as over any other property belonging to the United States; and this power is vested in Congress without limitation, and has been considered the foundation upon which the territorial governments rests. In the case of McColloch v. The State of Maryland, 4 Wheat., 422, the Chief Justice in giving the opinion of the court, speaking of this article, and the powers of Congress growing out of it, applies it to territorial governments; and says, all admit their constitutionality. And again, in the case of the American Insurance Company v. Canter, (1 Peters, 542), in speaking of the cession of Florida under the treaty with Spain: he says, that Florida until she shall become a state, continues to be a territory of the United States government, by that clause in the constitution which empowers Congress to make all needful rules and regulations respecting the territory or other property of the United States. If such are the powers of Congress over the lands belonging to the United States, the words, ''*dispose of*'' can not receive the construction contended for at the bar; that they vest in Congress only the power to sell, and not to lease such lands. The disposal must be left to the discretion of Congress.

In Rodgers v. Goodwin, 2 Mass., 476, the court says as follows:

''By the law of the Colony of Massachusetts, passed as early as the year 1636, (1) authority was given to the freemen of every town *to dispose of* their lands, etc. In the preamble to a statute passed in 1753 (1) it is recited that the proprietors of lands lying in common have power ''to manage, *dispose* and divide the same in such way and manner as hath been, or shall be concluded and agreed on by the major part of the interested.''

Of these statutes a practical construction early and generally obtained that the power *to dispose of* lands was inclu-

ded power to sell and convey the common lands.

In Lessee of James B. Clark et al., v. John Courtney et al., 5 Peters, 318, the syllabus is as follows:

''A power of attorney to sell, *dispose of*, contract and bargain for land, etc., and to execute deeds, contracts and bargains for the sale of the same,'' did not authorize a relinquishment to the state of Kentucky of the land of the constituent, under the act of the legislature of that state of 1794; which allowed persons who held lands subject to taxes, to relinquish and disclaim their title thereto, by making an entry of the tract or the part thereof disclaimed, with the surveyor of the county.''

The court further states on page 346: ''Another objection is, that the power of attorney produced, even if duly executed, does not justify the relinquishment. It purports to authorize Carey L. Clark,'' to sell, *dispose of*, contract and bargain for all or so much of said tract of land, etc., and to such person or persons, and at such time or times, as he shall think proper, and in our or one of our names, to enter into, acknowledge and execute all such deeds, contracts and bargains for the sale of the same as he shall think proper; provided always that all deeds for the land are to be without covenants of warranty or covenants warranting the title to the land from the patentee, and his assigns, etc.

And also on page 348, the court says: In point of fact then, the relinquishment gives them nothing as a compensation for the land; but restores back again only the money (if any) which they have paid. Can such a relinquishment for the purposes contemplated by the statute, be in just sense deemed sale? We think not. It is a mere abandonment of the title; or, in the language of the act, a relinquishment or disclaimer. The letter of attorney manifestly contemplated the ordinary contracts of bargain and sale between private persons, for a valuable consideration, and conveyance by deed without covenants of warranty. *The very reference to covenants, shows that the parties had in view the common course of conveyances*, in which covenants of title are usually inserted, and the clause excludes them. The statute does not contemplate any deed or conveyance, but a mere entry of relinquishment or disclaimer of record.

In Platt v. Union Pacific Railroad Co., 99 U. S., 48, the syllabus is as follows:

That the words ''*or disposed of*'' are not redundant, nor are they synonymous with ''sold,'' but they contemplate a use of the lands granted different from the sale of them, and that a mortgage of them is such a use.

Also on page 60, the court says: ''Congress must have been blind indeed, if it did not foresee this, and intend to au-

thorize the use of the lands to raise money by mortgage for the object it had so much at heart. This, we think, was what was intended by the phrase *"or dispose of,"* as distinguished from sold. Some of the lands might be sold as the work was progressing, and others could be used in aid of the construction only by pledging them to persons who might be willing to advance money on the faith of their prospective value. But whether sold or used as a security for money loaned to advance the construction of the road, they were equally employed for the purpose for which they were granted. The words, *"dispose of"* are undeniably apt words to indicate a transfer by mortgage.

Also in Beard v. Know, 5th Cal., 256, the court say:

"The statute of this state defining the right of husband and wife, passed April 17, 1850, provides that "all property acquired by either husband or wife, except such as may be acquired by gift, bequest, devise or descent, shall be common property." It is further provided, that the husband shall have the entire control of the common property, with absolute power *to dispose of* it, and upon the dissolution of the community by death of either the husband or wife, one-half of the common property shall go to the survivor, etc.

The words, "with absolute power *to dispose of,"* ought not to be extended to a disposition by devise. The husband and wife during coverture, are jointly seized of the property, with a half interest remaning over to the wife, subject only to the husband's disposal during their joint lives. This is at present, definite and certain interest, which becomes absolute at his death, so that a disposition by devise, which can only attach after death of the testator, can not affect it, for such a conveyance can only operate after death, upon the very happening of which the law of this state determines the estate, and the widow becomes seized of one-half of the property.

In Sheffield v. Lord Orrery, et al., Atkyns' Reports, vol. 3, p. 286, the court say:

First, it has been objected that the eighth clause is co-extensive with the ninth, and consequently if the house is comprised in the ninth it must be in the eighth, for it is that all things comprised in the eighth clause are directed to be sold, and consequently the house pictures and statutes must be sold contrary to the Duke's manifest intent.

This is clearly otherwise, for by the eighth clause the trustees are not directed to sell but *to dispose of* all his real and personal estate and therefore the word dispose does not import to sell, but to manage to the best advantage for the family; and the subsequent words, which direct to buy land are confined to

money, and can not extend to the house, statutes or pictures. And the general direction to sell is constrained in the fourteenth clause.

In Gordon v. Preston, 1 Watts., 386, is the following:

"By the second section of the act of incoproration the company was authorized to purchase in fee or for any less estate," all such lands, tenements and hereditaments, and estate real and personal, as shall be necessary and convenient for them in the prosecution of their works; and the same to sell and *dispose of* at their pleasure." According to the principle of Lancaster v. Dolan,1 Rawle, 131, a power to sell includes a power to mortgage, even under the statute of uses, though strictly construed; and a *fortiori*, it ought under a statutory grant which is to be beneficially construed in furtherance of the object. But the super-added words, *"dispose of"* which would otherwise be redundant, leave no doubt of the existence of an intent to give the corporation power to part with its real estate by any voluntary act, without regard to the mode of its operation; and, as a power to encumber, might be necessary to the prosecution of its works, it is not to be doubted that it was intended to be given."

In Fling v. Goodall, 40, New Hampshire, 219, the court say:

"But it is said that the terms used in describing the duties of the receiver in the two sections are different: that he is to "collect," in section 15, which it is said commonly refers to notes, and *"to dispose of"* in section 16, which it is said, can only mean to sell, and must necessarily apply to other property than notes, bonds or promises to pay. But we presume that the receiver under section 15, would not only need to collect, but, in case of a bond or other promise for the delivery of property (other than money), provided for in that section, he would be obliged to sell such property before he could apply the proceeds as that section directs. Under the authority to collect in this section, the receiver is empowered to collect, sell and do whatever is necessary should be done, to convert the notes, bonds and other property referred to in that section in money, so that he might apply the same to the payment of the claim of the principal debtor. And the same would hold true of the authority conferred upon the receiver in section 16, by the use of the words, *"disposd of."* It would probably occur to any competent receiver that the best way to dispose of a good note, in order to realize the greatest amount of money upon it, would be to collect it, and the best way to dispose of cattle, horses and carriages, would be to sell them at auction; and we have no doubt that the terms used in each section are comprehensive enough to confer

upon the receiver sufficient authority to do all that is necessary to be done in order to carry into full effect the provisions of these several sections, under such directions as the court are authorized to give him in each particular case."

In the case of the State of Minnesota v. Duesting, 33 Minn., 103, the court say:

"The court instructed the jury, under defendant's exception, in substance, that if they should find that defendant was keeping a saloon, and was a dealer in or vendor of malt liquors within the limits of the city, the word *"dispose"* as used in the ordinance, covered and forbade the furnishing and delivery, to the party named in the complaint, by the defendant, at that place, of malt liquors belonging to the defendant, whether he received any compensation therefor or not. In other words, within the intent and meaning of the ordinance, there might be, under such circumstances, an unlawful disposition by gift as well as by sale and barter."

From an examination of the foregoing, we find the words *"to dispose of"* have been variously construed at different times, under different circumstances, with different context and with reference to different subject matters, to mean, to sell, to mortgage, to lease, to govern, to manage, to collect and to give away.

The words "to sell" certainly have no such elasticity of meaning.

In New York it has been held that a power given to executors to sell, might, under certain circumstances, be held to include the power to dedicate certain streets.

In the matter of opening Sixty-seventh street, Howard's Practice Reports, p. 270, the court say as follows:

"It is no doubt true that the legal appropriation or dedication of real estate for the purpose of streets or public places is required to be made by the sanction or authority of the owner of the fee. The principle is so well settled as to require no reference to the authorities for the purpose of sustaining it. But the executors in this case, under the will of the owner of the fee, were, in terms, empowered to dispose of it. It is not necessary to determine the point, discussed to some extent, whether the provisions contained in the will on this subject, was a trust or mere power, for in either case the effect of the language made use of would be the same. By that language the testator authorized such of his executors as should take upon themselves the execution of his will, or the survivor or survivors of them, for the purpose of dividing his estate, or otherwise, to sell all or any part of his real estate, not specifically devised, either at public or private sale for cash, or upon credit, and upon such sale to execute the deeds necessary or proper to carry the sales into effect, and he then added, that the sales so to be made should be an effectual bar against the claim of any person or persons claiming under him. The portion of the testator's property through which the street in controversy was laid out, was not specifically devised by him, and for that reason it was comprehended within this power conferred by him upon his executors. The authority given to them to sell it was of a broad and unlimited character, allowing that to be done as their judgment might indicate it to be proper and advantageous to his estate. The property was valuable for the occupancy and use of persons desiring to improve it. It was situated in that part of the city where it was available to be built upon, and it could be sold for that purpose only by providing some means of access to it. If the lots had been conveyed without the advantages of a street in front of them, they would evidently have been of much less value than if that means of approach and enjoyment were provided; a proper sale of property of this description necessarily includes the power to provide some means of ingress and egress to and from it, and that in such a locality can be used as well by the owners as by all other persons passing in the vicinity.

In no other way can the proper advantage of this nature of property be acquired or enjoyed by the purchaser. The object of the testator in creating this power of sale, was to secure as large a sum as might be obtained from his property, and a division of it among his devisees, and whatever was necessary to promote that end must be included within the power created by this provision of the will. The power properly to divide and lay it out in lots and streets, was a necessary incident of the power of disposition given by the testator to his executors. They might, it is true, have sold the property as a mass, but it is evident that if they had done so that the purchaser or purchasers would have been obliged to have opened the street in order to give them the full benefit and advantage of their purchases and for that reason so much less would have been derived from the sale of the property, as the land was considered worth, which would be required to be included within the limits of the street. The executors, in the exercise of their judgment, considered that not to be a favorable disposition of the property which they sold. They chose on the contrary to divide it up into lots bounded upon this street themselves, with the probable expectation that in pursuing that course more money would be derived from it than by a sale of it in any other manner. This was a subject which the testator had left to be determined by the judgment of his acting executors, and in what they did, they seem to have been warranted by the authority created by the will."

To the same effect is Earle v. New Brunswick, 38 New Jersey Law, p. 47. Also see Wisby v. Boutt et al., 19 Ohio St. 238.

Looking then, to the declaration of trust in the case at bar, evidently drawn by no unskilled hand, the parties seem to have eschewed words and expressions of limited and narrow meaning, and to have chosen rather, the larger and generic term "*to dispose of.*" Looking again to the subject matter of this trust, this platted sub-division and the purpose and object of the trust to market its lots, I am inclined to adopt the language and reasoning of the court in the matter of opening Sixty-seventh street, supra.

It was a devoting of a part of this property to the purpose for which it was granted.

Vid, Platt v. Union Pacific R. R. Co., supra.

I am of opinion that when James E. Mooney signed these petitions he had the power to do so.

7. As to the signature of Orris P. Cobb, trustee, as there was no declaration of trust or anything in the deed conferring powers upon the trustee or defining his powers, I am of opinion that Orris P. Cobb as such trustee, had no power to sign the petition.

I find from the fact of signing, and from the evidence as to the authorization so to sign by Wallace Burch, that Orris P. Cobb and Wallace Burch, each of them, to the extent of their individual interests in the property represented by such signature are estopped to deny such signature, but they are not estopped to deny that the commissioners ever obtained the requisite majority, or to set up any irregularities in the proceedings by the commissioners.

8. I found above that on account of the A. & H. Knorr signature, both petitions in this case must fail as petitions. Hence, on the question of estoppel, the rights of all the plaintiffs herein, must be determined without reference to the petitions, as though there never had been an attempt to get up a petition. For the mere signing does not estop the plaintiffs from asserting the defect in the petitions.

Bottom of page 300, Tone v. Columbus, 39 Ohio St.

Signing may be one of a number of acts, which taken together might work estoppel, but by itself it is not enough.

Bottom of page 300, Tone v. Columbus, 39 Ohio St.

The rules then, as to estoppel by which the conduct of all the plaintiffs herein (excepting two whom I shall mention) is to be measured, are those laid down in the Tone case, as applicable to the so-called "*silent ones.*"

Tone v. Columbus, 39 Ohio St., on page 303, of the opinion.

1. That he knew the improvement was being made.

2. That it was intended to assess the cost thereof upon his property.

3. That he *knew* of the infirmity or defect in the proceedings, under which the improvement was being made, which would render such assessment invalid, and which he is to be estopped from asserting.

4. Some special benefit must have accrued to the owner's property, *distinct* from the benefits enjoyed by the citizens generally.

It is the third of these requirements which is totally lacking in the proof introduced to establish an estoppel.

In fact, the irregularity in the proceedings of the county commissioners, to-wit: that they were proceeding on an insufficient petition will not be definitely known until I shall have so determined by announcing my decision in this case.

While such silent owners may be presumed to know of the invalidity of the statute, a presumption of knowledge does not exist with regard to the illegality of the proceedings of the public officers, which they have the right to assume are regular until they have knowledge to the contrary.

Tone v. Columbus, 1 C. C., 312; Matter of Sharp, 56 N. Y., 257, and supra.

9. I now come to the inquiry whether any of the plaintiffs in this case participated so actively in pushing these improvements as to be estopped from denying the validity of the proceedings, and the assessments made in pursuance thereof.

Bottom of page 300, Tone v. Columbus, 39 Ohio St.; State ex rel. Mitchell, 31 Ohio St., 592, 2nd syl.

From the evidence I find that there are two, who have from beginning to end participated with great activity in pushing these improvements and causing them to be made, Wallace Burch and Tilden R. French, and I am of opinion that they are estopped.

10. Another question is urged, whether such estoppel of Burch and French is confined to themselves or extends to those whom they represented in various capacities of agency.

As I said above, signing such a petition is an exercise of the highest power over property. So I think that acts which by estoppel are to be construed as fastening a lien for assessment upon such property should be of the same high character. If such acts, which are to be so construed by estoppel, are performed by an agent, the agency to perform them must be clearly shown by those who seek to avail themselves of the estoppel.

The acts are of too great consequence, and the results too important to have the power to do them lightly attached to agencies of a general nature or for other purposes.

.The agency might be in the first instance or by ratification, but must be specifically proven.

This the evidence in this case fails to do, hence, the estoppel of Burch and French is confined to their own particular interests.

11. In conclusion I am of opinion that all the plaintiffs herein are entitled to a perpetual injunction against defendants, enjoining them from the collection of these assessments, excepting Wallace Burch and Tilden R. French, and as to the interests owned by them in their own rights respectively, the injunction will be denied.

Frank M. Coppock, Charles T. Coppock, John W. Warrington, Wallace Burch, W. J. Davidson, for plaintiffs.

Frank Dinsmore, Rendigs, Foraker & Dinsmore, for defendants.